Pulse Network, L.L.C. v. Visa, Incorporated Mr. Clement, are you on? Good afternoon, Your Honors, and may it please the Court, Paul Clement for the appellants. In a remarkable, meandering, seven-page opinion, citing not a single circuit precedent, the to a direct competitor challenging the exclusionary practices of a dominant firm with undoubted market power. If the Court had cited this Court's decision in Doctors Hospital, it might have recognized that antitrust standing was readily satisfied for these classical antitrust claims by an allegedly excluded rival, and that it was conflating merits questions with antitrust In reality, as a competitor alleging exclusionary practices by a monopolist in an industry where prices are rising in the wake of Congressional action designed to lower prices and increase competition, Pulse's antitrust standing is plain. The weakness of the District Court's antitrust standing is well illustrated by Pulse's challenge to the PABD mandate, or the paved mandate, as both an exclusionary practice under Section 2 of the Sherman Act and an unlawful tie under Section 1. This mandate unlawfully ties signature debt products, over which Visa has undoubted market power, to pinned debt products where Visa faces competition. As a competitor for supplying the tie product, Pulse has undoubted antitrust standing. Indeed, I looked and looked and looked to see if I could find a single case that denied antitrust standing to a competitor in the tie market, and I could not find one. I just think that's about as bright a line of rule as you can find in this area, is that if you are a competitor in the market for the tie product, you have antitrust standing to challenge the unlawful tie. You might lose on the merits, but as far as antitrust standing is concerned, there's not really a difficult issue. The same basic logic applies to the challenge to the FANF pricing structure, that's the F-A-N-F pricing structure. FANF operates as a de facto tie between, again, the debt signature market where Visa has undoubted market power, and the pinned debit market where it faces competition by essentially tying its price for providing any service, whether it be debt signature or even a credit card. If you want that as a merchant, you have to pay a large upfront fee, and then as a result of that large upfront fee, which is expressly tied together in Visa's own explanation of its new pricing practice, you will get a much lower per transaction price for the pinned transactions in the debit markets. If Pulse had used this FANF pricing mechanism, would that have imposed any antitrust consequences? If Pulse had done it, it would not, for the simple reason that we don't have market power. And I don't think it's terribly controversial to say that there are practices, including an exclusive dealing practice, that if done by a monopolist, raise at least a colorable issue in antitrust case. When's the last time the Supreme Court approved an antitrust violation under a tying clause? Well, I think if I'm right, when Eastman Kodak, they let that case go forward. So, you know, over the dissent of— Was I alive then? Eastman Kodak shook, absolutely. Even I was alive, and I was in law school. I'm thinking of the 1949 Eastman Kodak. No, no. This is the more recent one where it was a claim by the servicers that there was a tie. And, you know, I mean, you know, far be it for me to prospect the Supreme Court's opinions, but that seems like a far more controversial case because there, you know, the market was essentially servicing Eastman Kodak copiers, and I might have thought that that wasn't a sufficient market definition. But I don't think there's any question here we have a valid market definition. I don't think Visa, at least at this stage in its proceedings, hasn't quarreled with it. And they do have this undoubted market power over the Visa signature debt product, and they're plainly using that to manipulate the pricing in the market for the place where they're facing some competition, which is for these PIN transactions. You know, there's been this debate in the briefs about whether this is sort of predatory pricing. I would say it's more anti-competitive than predatory pricing for two reasons. One is, I mean, the reason we didn't allege it is predatory prices because prices in the market are, in fact, going up. I mean, you know, the ultimate market we define in our complaint is the market for debit processing services. Well, they must be going up for Pulse also. Well, but that's the problem. If you didn't have this kind of tied together FANTA structure, then if a monopolist wants to raise prices, they do it at the expense of competitors coming into the market and taking market share. And if all Visa wanted to do tomorrow is raise all their prices, we'd be happy with that because the merchants would be upset and they could respond by buying more of our services and there'd be more competition. But Visa went out of its way. I mean, it's clever. In a world without antitrust laws, it's super clever. It was super clever to have the Durbin Amendment passed at the impulse of companies like Pulse, which were trying to get a leg up on regular competition by having legislation intervene. So it's harder for me. Plus, there's been considerable technological evolution in this market for the benefit of somebody. So a couple of things there, Judge Jones. I don't know. I'm just being rhetorical. No, no. I understand. But I'm here to respond to your rhetoric as well as your questions. And I guess I would say, I mean, obviously, whatever role Pulse or the merchants had in getting the Durbin Amendment, I mean, that would be protected by Norm Pennington and the likes. There's no antitrust issue there. And then to me, and look, this gets into the merits, and I want to keep you focused on the standing issues because that's where I think – I mean, that's how we lost this case in the district court. And that's where I think this is an obvious error. But even if you're not – even if you're skeptical of some antitrust suits, I just don't think this is an antitrust suit to be particularly skeptical of because by whatever means, the Durbin Amendment passed and everybody, including Visa, expected the prices for these debit transactions to go down. And in fact, they have gone up. I mean, that's our allegations, our complaint, and that's backed by the Federal Reserve data. So there really isn't any means to dispute that. The prices in the market after the Durbin Amendment have gone up, and I don't think anybody expected that, and I think there is reason to believe that the only thing that could produce that is something that runs foul of the antitrust laws. Now, we'd like an opportunity to prove that, and the ultimate question for you right now is whether we're a proper party to raise those claims, and I think we are pretty self-evidently a proper party to raise those claims, which is, as I say, the issue at this stage of the proceedings. I would also say, just in the similar vein, what makes the fact that prices have gone up in this market particularly remarkable is the prices have gone up even more for the Visa debit signature product, and this is all in a context where in the rest of the world, if you do these debit transactions, you tend to do them on a PIN network because it's more secure. So we have a dynamic in this country where the network that is the most secure and cheaper is not being utilized to nearly the same degree as the debit signature market, and it seems to me that, again, even an antitrust skeptic might think, if the United States is still operating with buggies and the rest of the world had cars, I think an antitrust investigation into the buggy business might be worthwhile, and I think that's kind of the broader dynamic of this industry right now. The only other point I would like to make before I sit down and save any time for rebuttal— Well, just wait a minute. Sure. You know, you take me—you really—I mean, I thought I read the briefs pretty carefully, but I didn't recall your talking a whole lot about standing to assert a tying claim. It's in there, Your Honor, and it's particularly clear in the reply when we talk about the PAVD mandate, which I think is the clearest tie, and I just offer it to you as an easy way to understand why we have antitrust standing. So, I mean, it's an analytical tool, but we clearly—the PAVD mandate is a tie, and particularly if you look at the yellow brief, that's exactly how we talk about it. In terms of the last thing I'd say, there's kind of three things, three exclusionary practices here that are being challenged. There's the PAVD mandate, there's the FANF structure, and then there are the other exclusionary practices. I just want to point out that as to the other exclusionary practices, VISA hasn't even—in the district court, and I don't think here, really even has an antitrust standing objection. They really have a failure to state a claim argument that I think is exceptionally premature given that we haven't had merits discovered. So the last thing I'd say before I sit down is— Well, just wait a minute. Sure. You know, Pueblo-Volmat, Atlantic Ridge Field, why are you in the zone of interest for which we should allow trouble damages actions to proceed? Well, because— You're a competitor. Yeah, we are a competitor who is challenging the exclusionary practices of a monopolist. Well, so are the consumers, evidently. They're a merchant standing class or merchant antitrust class pending. Absolutely, Judge Jones, but it is, I think, black-letter law that you can have both consumer claims and merchant claims and competitor claims because they suffer different injuries. Theoretically, that's true, but what is there about these exclusionary practices that uniquely harms you? In other words, how do you get around Volmat? Well, so for one thing, I just don't think Volmat is much of a problem for us. I mean, that's a situation where somebody was trying to directly benefit from essentially the increased market power that would happen if another bowling alley went out of business and then it was sort of propped up by somebody in the court that I think correctly said, this has nothing to do with antitrust injury at all. You're not really even injured in fact by anything that violates the antitrust law, and that's not the case here. We are saying we are injured in fact through lost profits and we are injured in fact through the inability for us to get to market with or to fully get to market with a product that would allow the processing of signature debit claims over a PIN network. That's the post-pay express product. Those are two distinct antitrust injuries, our lost profits and our inability to get that sort of competitive product to market, and both of those are kind of unique to us and not separate by the merchants. Now, the reason that the merchants are here filing an amicus brief and supporting our claim is because I think the amicus, the merchants understand that the only reason, the only way they're going to benefit in the long run is if there is meaningful competition against the Visa debit signature product, and the way to get meaningful competition against the debit signature product is to have vibrant PIN products on the market. That's why they think every one of these practices hurts the merchants, even the ones that Visa says, you know, they want to point to the PAVD mandate and say superficially that supports the merchants. I thought Pulse was hurt in regard to the PAVD mandate because it had had an exclusive dealing contract. Am I getting that right? Pulse had had exclusive dealing contracts, and then they were deprived of those. They had had – so we think we're principally injured because it's a tie. What it does is it prevents us as – From having your own exclusive dealing. Exactly, which we're allowed to do as a non-monopolist, and that is – and again, that's why the merchants support our claims because they recognize that in the long run what the PAVD mandate does is it essentially makes the competition between Visa signature, a Visa PIN network, and a true competitive non-Visa PIN network. I don't care what the merchant's interest is here. I care how your interest is affected by this. And as directly as any victim of an exclusionary practice by a monopolist. Whenever there's a company – I mean, look at – as of yet, Google has not been found to be a monopolist, but it offers a service at a price that nobody else can match. Does that mean it's violating the antitrust laws or that there would be entrants who are prevented from entering the market? That's a completely different question. Well, and it's largely a merits question, though, Your Honor, with all due respect. You have to be in the zone of interest, and competitors are not inherently in the zone of interest. They are when they are challenging a tie. They are when they are challenging a Section 2 exclusionary practice. They're exactly who should be bringing these claims. Well, maybe that should have been in the primary brief instead of the rebuttal brief. I'm sorry if I didn't pay attention properly. Well, Your Honor, certainly whether we focused on it in tie terms or in exclusionary practice terms, I think it's just part of the reason why it's so clear that – and I think you said as much in Doctors Hospital – why it's so clear that an excluded competitor has antitrust standing to bring a challenge is because they are, when it comes to exclusionary practice under Section 2, they are an absolute proper plaintiff. They're kind of the classic plaintiff for that kind of claim. The only thing else I want to say before I sat down is just this industry, as I think Judge Jones alluded to, is very fast-moving. This litigation has not been fast-moving. I think particularly given that one way to understand the error that was made here was that the district court judge jumped to the merits and essentially prejudged them. I do think this is the rare case where the court and the parties would benefit from reassignment. We don't make that suggestion lightly, but we do think the combination of the way this case is proceeded and the comments on the record, I mean, it's perfectly well and good for George Priest to say that 100 years of antitrust law have been a wrong turn, but George Priest isn't going to go ahead and turn around and adjudicate a plaintiff's antitrust case. I just don't think those comments were proper and combined with the way the case is proceeded. We do think this is the rare case.  Thank you. Chief Judge Owen, and may it please the Court, with the utmost respect to my friend, this is precisely the type of case that antitrust law directs courts to be properly leery of. The law simply doesn't allow the powerful medicine of antitrust to be administered if a plaintiff hasn't been injured in a way that reduces competition. The undisputed record evidence here shows that Pulse's injuries resulted from increased competition in at least two ways. First, as to pin authenticated Visa debit or paid, that ensured merchants would have a choice in routing debit transactions and made Pulse, in its own words, compete for every one of those transactions, and that's at the record 3554 and 3557. Second, Visa competed vigorously through fixed acquired network fees, or FAM, and discount agreements to win those transactions, forcing Pulse to lower its fees. Pulse's resulting injuries are textbook injuries from competition, not antitrust injuries. I think the Supreme Court's decision here in Cargill— What are the respective market shares in the times we're talking about, Visa versus Pulse, on the credit card? I mean, their whole argument is Visa is so massive in the retail that no retailer is going to say, Visa, we're not going to take your—we've got to take your credit card transactions, and it seems to me that's a pretty powerful argument. Yes, Your Honor, and I think we've heard a lot from my friend on the other side about the difference between standing injury arguments and merits arguments, and I think that's a classic example of a merits argument that was— Well, they're saying the injury is that every retailer basically is going to let Visa— is going to use one of the Visa products because of the huge market share. What is Visa's market share? Yes, and I don't think the record discloses those arguments. Let me respond directly to your question about their argument and why it's wrong. They do claim—I think it's important to understand that as to Paved, it's the issuer, right? So their argument is that they're trying to show antitrust injury by saying that Paved is an exclusionary, unlawful time arrangement, and Judge Jones, you're right. They didn't—they actually didn't use Eastman Kodak in their brief with respect to the time claim, and I think for good reason because the one thing Paved can't be is exclusionary, and that's because on the issuer side, right, and that's where Pulse alleges the violation is, right, the Durbin Amendment requires at least one non-Visa network on every Visa debit card. So even if Paved did eliminate a competitive alternative to Visa's products from the issuer side of the market— that's Pulse's argument on page 14 of its reply—that harm would be to issuers, not Pulse. And on the merchant side, Chief Judge Owen, it is undisputed that Paved is optional, and that's in the record at 3230 and 31. Pulse's argument about FAMP fares no better. I mean, Pulse's own economist, Dr. Hausman, said at page 4995 of the record that FAMP injured Pulse by causing it to lower its per-transaction fees to compete with Visa. That is not antitrust injury, as the Supreme Court said in Atlantic Ridgefield at page 340. Well, see, to me you're slicing off a whole big chunk of it, because the argument is that the retailers are not going to shut Visa out of the market because there's all the consumers, so many consumers use their Visa cards. So they come in and Visa says, all right, you have to pay a monthly fee or we're not going to do business with you at all. And retailers say, okay. And then Visa lowers its transactional fees, which is where it's competing with Pulse. So at that level, yes, Pulse has to lower its transactional fee, but Pulse doesn't have the kind of tying arrangement power, it seems to me, that Visa has to force the monthly payments in the beginning. A couple of responses to that, Your Honor. And I think one thing that Your Honor's question brings to the fore is there's a mismatch here between the alleged injury and who is actually affected. With respect to PAVD, that's how I'm going to issue it. I'm not talking about PAVD. With respect to FAMF, it's the acquirers who are paying FAMF, not Pulse. So I think for that reason alone, it can't look to that for antitrust injury. But more to the point, I think, again, the Supreme Court's decision in Cargo and also Matsushita, I think, directly rejects the exact same argument that Pulse is making here, where even if you look at, I think what they're alleging is really a price-cost lease. Even if they're saying, well, the fee standing alone, we don't have a problem with that. The lower transaction fees, we don't have a problem with that. But somehow, when you put the two together, that's a problem. I think the Supreme Court in Cargo rejected just that sort of argument, where it held that a competitor lacked standing to challenge a merger that would have given the defendant market power in one market to reduce prices in another. And so that was a classic cost-squeeze argument, just like Pulse is alleging here. And the Supreme Court rejected that argument because there, as here, the competitor's only injury was lost profits from lower prices. The court also emphasized there that the competitor didn't claim that it would be driven from the market, only that it would lose market share from price competition. That's exactly the same argument that Pulse is making here. Pulse hasn't claimed or shown it would be excluded. I think this court's decision in Doctors Hospital, far from helping my friend, I think shows why there is no standing in this case. And Pulse hasn't shown or even claimed that it would be excluded, just that it would lose share from price competition. And that's simply not enough for antitrust standing. Again, to return to PAVED and Your Honor's questions, Chief Judge Owen, Pulse labels FAMF exclusionary, like it does with PAVED, and it argues, we've heard that today, that FAMF effectively forecloses Visa's rivals from competing. But FAMF could only effectively foreclose Pulse from competing if Pulse couldn't beat Visa on the per-transaction fees. Nothing in the record suggests that it couldn't. Indeed, it's undisputed in the record that Pulse could profitably compete with Visa's lower per-transaction fee. Now, you're saying that's in the summary judgment record? Yes, at 1757. What kind of evidence are you talking about? Yes, that was Pulse's counsel at the hearing, basically making the statement that Pulse could go to zero on the merchant side because it would still have the issuer side to deal with. To use its own hypo in the reply brief, Pulse may not like charging $4 a transaction where it used to charge $10, but without predatory pricing, and as my friend said, that is not something they are alleging or claiming here. The antitrust law simply doesn't care. I think the bottom line is that just slapping the label of exclusionary on price competition doesn't get your antitrust standing. All price competition, every contract, every agreement excludes somebody. If all you lose is market share, that is not enough. You may be having a tougher time competing in the market, just like this court said in Felder's, but you're not excluded from the market, and Pulse hasn't alleged or shown that. They were talking also about being unable to bring another product to market? Yes, that is their claim. Pulse expressed pain. Yes, yes, and that is the one claim we think fails for both loss of antitrust injury and injury in fact. This court's jurisprudence in Sanger and Jaco with respect to a nation competitor like Pulse is very clear that there has to be that the inability to succeed can't stem from other sources, and here the record establishes very clearly, Pulse said below, that a dramatic loss of volume made it nearly impossible for Pulse Pay Express to succeed. That's 2785 of the record. Pulse never said until appeal that Visa's conduct caused the dramatic loss, only that it coincided with it. That's the record, 4709, 4785, and 4966. So you're talking about representations in open court? Talking about their written records that coincided. They coincided. They did not say until their brief in this court that it caused. I'm a little reluctant to hold, unless they're very definitive and insensitive, but maybe the oral conferences in this case were not particularly definitive. I'm really reluctant to sort of hold counsel's statements against the client in a complicated case like this. No, I understand, Your Honor. These were actually referring to what they claimed in their written notes, and I think the reason that counsel was careful to say it coincided rather than caused is because the only dramatic loss Pulse suffered was in 2015 when its largest issuer, the Bank of America, dropped it for arrival. That's undisputed, and it's enough for Pulse to fail the Sanger test because there's no standing where, as here, plaintiff's insufficient preparedness to enter the market flowed from obstacles unrelated to the alleged anti-competitive conduct. Let me ask also about how this case developed in Judge Hughes' court, and I've forgotten this, I ought to remember. Did Pulse ever suggest that it needed more discovery for the purposes of standing? I know it complains that discovery was arbitrarily limited, but there wasn't something like a 56-F motion, was there or not? Your Honor, there was, in the alternative, there was a 59-D motion. Pulse has not appealed that. It has not appealed the denial of its alternative motion in opposing summary judgment. I do think the record, and I want to be fair and clear, I don't believe that below they distinguished, my friend Pulse distinguished, between the discovery it needed for standing and for the merits. Nonetheless, I think the discovery that they got, and after all, we're here on antitrust injury, and no one better than Pulse should know how and why it's injured in a way that the antitrust law cares about. So we think whatever their complaints about discovery, which we don't think are well-founded, and in any event aren't before this court because Pulse has not presented to this court as a reversible error, any discovery order or the denial of its alternative motion for more discovery. So we simply think that's a non-issue, that Pulse had more than enough discovery, particularly, as Your Honor highlights, on the standing issue that is before this court. And to sum up, Your Honors, I think this case shows why the antitrust standing requirement is so critical to protecting competition and not competitors. But Pulse is here trying to secure in the courtroom what it couldn't achieve in the marketplace, and allowing this suit to go forward would be inimical to the goals of antitrust law, and the judgment should be affirmed for that reason. If there are no other questions. Yes. Thank you, Your Honors. Thank you. Mr. Clement. So why don't you speak to the discovery discussion that we've just heard. What discovery did you seek that you didn't get as to standing and injury? So we took the position that we wanted much more extensive discovery before there was a ruling against us on standing and injury. But once we got – but principally what we had insisted on throughout this case is we want full discovery, and we particularly need it for the merits. Once we got the adverse ruling on summary judgment on antitrust standing, we took a – made a judgment that that's what we were going to appeal. I think the decision is manifestly wrong on the current state of the record. We assume that if we get it reversed and we're sent back down to whichever district court, that merits discovery is – will then sort of ensue in a more normal way. I mean this is – it's a very strange case, but we have not gotten any party discovery against Visa at all. And what we have – the sum total of what we have is a little bit of information about one merchant and one merchant acquirer, and then we have some information from – I think it's one court, the third court in 2015 about what some of the agreements look like. That's not – I mean your client has had some access to the discovery in the other cases, right? No. None? Very limited. I would say none. I mean we have access to something that ended in 2012, which is when a lot of these allegations began. We made subsequent requests to try to get access to discovery that Visa had already produced in other litigations, so the burden on Visa would literally be pushing a button, and we were denied that discovery. So we're doing this on a very thin record. But the principal reason we're here is the district court thought this was sufficient to rule against us on antitrust standing, and I think that just is plainly and demonstrably wrong. I'll just make a couple of points in rebuttal. There was a suggestion that we never cited Eastman Kodak. We cited Eastman Kodak in our opening brief and in our reply brief. I double-checked Judge Jones and we – I know. It's on pages one and two for very general – of the reply for very general – and then I think it's on page 40 of the opening brief, and then if you look at the very first line of page 45 of the opening brief, you'll see where we specifically labeled the PAPD mandate a tie in the opening brief. So I think it's a matter of emphasis. To me, it's a way to make the antitrust standing issue more understandable. The basic point, though, is that an excluded rival suing an alleged monopolist, we have antitrust standing. The other point I'd just like to make very briefly, there was an effort to rely on the Cargill case. You know what? I'm sorry, but I just have to mention this. Page 40 of your opening brief, see Kodak, the Image Tech Services print, noting the importance of considering, quote, actual market realities, close quote. I did not interpret that as a reference to a tying. But what about the line on page 45 where we specifically called the PAPD mandate a tie? All right. Section 1 tie is an uncommon claim. But it's in our complaint, and it's part and parcel of why we're here, and it's part and parcel of why we have antitrust standing. And I think we have antitrust standing for the other claims. There was some effort to get some benefit from Cargill. Cargill's a classic case where if you're a competitor of competitors who have merged and concentrated the market, you're liable to benefit from that concentration in the market. So of course you don't have antitrust standing. The Atlantic Richfield case is a case about a vertical maximum price fixing conspiracy. The people who sued were the competitors of the ARCO retailers. They shouldn't have sued for antitrust. They should have sent a thank you note to ARCO's parent for imposing a restraint that, based on the theory of antitrust, should have limited the ARCO retailers' ability to compete against the plaintiffs. They were exactly the wrong party to bring that suit. Those are the kind of claims that should get dismissed on antitrust standing. This claim is nothing like those claims. And then as to the predatory pricing, again, the reason we didn't bring this as a predatory pricing claim is because prices went up. And prices went up based on a tactic that didn't allow the one thing that's supposed to happen when prices go up in a market, which is the monopolist is supposed to lose market share, and it's supposed to create an opportunity for companies like Pulse. I thought – maybe I've got this backwards in my mind, but I thought your argument is based on unifying the price scheme, the FAMP scheme, right? We want to look at the whole – right. I'm sorry. Yeah. The prepayment requirement and then the volume discounts, right? You're putting all those together, right? We think they were tied together intentionally by these. Okay. And then you're saying that prices – there's no predatory – but you're not competing against the main one. You're competing against the marginal price. That's true, Your Honor. So I think we have a very strong argument either way you look at it. If you look at the whole market, the problem isn't predatory pricing because prices went up. If you look at just the pin market, then this is worse than predatory pricing because predatory pricing, the way I always understood it, is you're skeptical of those claims because the prices go down in the short run, and then the monopolist had to recoup that in the long run, and that was difficult and speculative. Here, this is infinitely sustainable because they're taking their ability to demand a huge, super competitive price for the debit signature or even a credit card, and then they take that and use that money to finance their below-market price in the one place where they face competition. Then how do you respond to the contention that – which did come apparently from the counsel's argument below that Pulse could go to zero charged to merchants? I think in context all he was saying is – I think it was he – but all the counsel was saying is that because it's a two-sided market, in theory you can charge zero and still make a little bit of money on the issuer side of the market. But that doesn't – I mean the fact that we might be able to do something at these prices doesn't mean it's not anti-competitive and certainly doesn't mean – Well, it just means you're making less money than you'd like to. Sure, and in a market where we're making less money than we'd like to because a monopolist is engaged in exclusionary – Sure it is, Your Honor, with all due respect, and I don't even think Visa takes issue with this. Even though Congress required that there be a competitive pin availability on each of the signature – Sure, but what it did is it used its monopoly power in the debit signature market to make sure that there would never be just a non-visa option. What's your closest analogy to that? This is something you just have to prove at trial is your contention, right? It is, but I don't think it's – I don't think this is going to be a difficulty. I mean again, my learned friend didn't give you the direct percentage of Visa's market power. I know, but – But that's because they've never contested it. Well, I know. It's 70 percent or something, right? And they've never contested they have market power. And so then they – Okay, so what's your best case for market power of a certain size where the alleged monopolist is required to make available basically shelf space for his competitors? I think I would – I mean I think our closest cases are probably the cases that treat the honor all cards policy and the all-Visa policy as anti-competitive. And I think that this is just a variation on what Visa's been trying to do for years and years and years, which is they started with a monopoly in the credit card market. They used that to essentially create a monopoly in the debit signature market. And now they know the greatest threat to that is debit pin, so they're doing everything they can to suppress that market. If I could say one last thing about the last claim, my friend on the other side made a big deal about how we say we only lost money or market share in 2015, and that was because Bank of America. We have suggested that – and alleged, and the evidence shows that we have lost market share since 2012, which happens to coincide exactly when Visa imposed this package of exclusionary practices. That if we want to get into a factual debate about how much of our loss of market share was attributable to temporarily losing the Bank of America account in 2015, I just can't imagine a more merits-based, sort of fact-based issue that should be resolved after discovery. Would you please identify precisely the claims that you suggest they conceded might not be – in your original argument, you said they hadn't addressed certain claims in the standing context. So maybe it's more like a failure to state a claim or something. Exactly what are those? Where are they memorialized? Those are the claims that go to the exclusionary practices and go to Pulse Pay Express, and you can just look. All they filed below was a Rule 12 motion on that because it was for failure to state a claim. They didn't include that. And Judge Houston ruled on that. Well, he did. Well – He just – he wrapped it all up. So he granted them relief on antitrust standing that they didn't even ask for, which I think is kind of emblematic of the way he handled the case. Was that raised in your briefing? Yes, we mentioned it. Okay. If there's nothing further, Your Honor. Thank you. Thank you, counsel.